UNITED STATES, Appellee,

v.

Barry S. BICKEL, Private, U.S. Army, Appellant.

No. No. 61,475.
CM 8800197.

U.S. Court of Military Appeals.

Argued Oct. 4, 1989.

Decided Aug. 10, 1990.

For Appellant: *Captain Gregory A. Gross* (argued); *Colonel John T. Edwards, Lieutenant Colonel Russell S. Estey, Captain Keith W. Sickendick, Captain Jon W. Stentz* (on brief).

For Appellee: *Major Gary L. Hausken* (argued); *Lieutenant Colonel Gary F. Roberson* (on brief); *Lieutenant Colonel Daniel J. Dell'Orto.*

*Opinion of the Court*

EVERETT, Chief Judge:

Bickel was convicted by a special court-martial at Fort Polk, Louisiana, of wrongful use of marijuana and absence without leave, in violation of Articles 112a and 86, Uniform Code of Military Justice, 10 USC §§ 912a and 886, respectively. His sentence by the military judge to a bad-conduct discharge, as well as confinement and forfeiture of $438 pay per month for 4 months was approved by the convening authority. The Court of Military Review affirmed by a divided vote. 27 MJ 638 (1988). We granted review of these two issues concerning the legality of a drug test to which appellant was subjected:

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS EVIDENCE OF A URINALYSIS SUPPORTING THE SPECIFICATION OF CHARGE I AND CHARGE I.

II

WHETHER A COMMANDER'S PUNITIVE POLICY PROVIDING THAT ALL SOLDIERS WHO "TEST POSITIVE"

FOR ILLEGAL DRUGS MUST BE RE-TESTED WITHIN ONE MONTH IS AN "INSPECTION" FOR THE PURPOSES OF MILITARY RULE OF EVIDENCE 313 AND ARMY REGULATION 600–85, TABLE 6–1.

## I

On June 10, 1987, appellant and other randomly selected soldiers in his company submitted urine specimens to be tested. Bickel's urine tested positive for marijuana, and on July 17 the test results reached his company commander. On July 21, when urine specimens were being obtained from 27 other soldiers in his company who had been randomly selected, Bickel was required to submit another specimen for urinalysis. Bickel's second test was directed pursuant to a policy letter issued by his company commander in May, which provided that "[a]ny individual prescreened positive during monthly random urinalysis testing will be rescreened during the following month's urinalysis."

After Bickel had furnished the first urine specimen, the company commander received information that led him to suspect that appellant would test positive again; and, indeed, this was the outcome. The results of the second urinalysis were the basis for convicting Bickel of wrongfully using marijuana.

## II

### A

■ "Nonconsensual extraction of body fluids, including blood and urine, may be made from the body of an individual pursuant to a search warrant or a search authorization"; but there must be probable cause to believe that the body fluid contains "evidence of crime," and the extraction of the "fluids ... must be done in a reasonable fashion by a person with appropriate medical qualifications." Mil.R.Evid. 312(d); *see* Mil.R.Evid. 315, Manual for Courts-Martial, United States, 1984. We have no doubt as to the constitutionality of such searches and seizures based on probable cause. *Cf. Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

■ However, compelling Bickel to provide the second urine specimen cannot be justified as a probable-cause search. Almost 6 weeks passed between the obtaining of the first urine sample on June 10—which tested positive for marijuana—and July 21 when the second specimen was obtained. Even though the metabolite of marijuana will remain in the body and be discoverable by urinalysis for a longer period than metabolites of some other drugs, we believe that—because of "staleness"—there was no probable cause to direct Bickel to submit to the second urinalysis. *See United States v. Poole*, 30 MJ 271 (CMA 1990); W. LaFave, *Searches and Seizure* § 3.7 at 75–88 (2d ed.1987).

If, therefore, reception of the evidence of the second drug test is to be justified, it must be pursuant to Mil.R.Evid. 313, which authorizes reception of "[e]vidence obtained from inspections and inventories in the armed forces conducted in accordance with this rule." According to Mil.R.Evid. 313(b):

An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. *An order to produce body fluids, such as*

*urine, is permissible in accordance with this rule.* An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) *specific individuals are selected for examination;* or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R.Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

(Emphasis added.)

The rationale for Mil.R.Evid. 313 was set forth in *United States v. Middleton,* 10 MJ 123 (CMA 1981), which arose under an identical evidentiary rule prescribed in the Manual for Courts–Martial, United States, 1969 (Revised edition). We suggested there that, in view of "the exigencies of military necessity and unique conditions that may exist within the military society, ... it is foreseeable that reasonable expectations of privacy within the military society will differ from those in the civilian society." We recognized that "military inspections ... are time-honored and go back to the earliest days of the organized militia. They have been experienced by generations of Americans serving in the armed forces." Indeed, "the inspection has traditionally been a 'tool' for a commander to use in ensuring 'the overall fitness of [his] unit to perform its military mission.' " 10 MJ at 127.

Furthermore, "the traditional military inspection which looks at the overall fitness of a unit to perform its military mission is a permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion *which a serviceperson must expect in a military society."* 10 MJ at 128, quoting *United States v. Roberts,* 2 MJ 31, 36 (CMA 1976) (emphasis added there). In *Middleton* we went on to state:

> Upon this analysis, then, we may safely conclude that during a traditional military inspection, no serviceperson whose area is subject to the inspection may reasonably expect any privacy which will be protected from the inspection. The servicemember would not normally expect it; and if he did, the parent society would not be willing to honor that expectation.

10 MJ at 128 (footnotes omitted).

Even before *Middleton* was decided, we had acknowledged that drug use in the armed services harms the military mission. It diminishes the military effectiveness of the servicemembers who are using drugs; and, when such persons are entrusted with important responsibilities—sometimes involving access to complex equipment or to lethal weapons—it may endanger other persons, their property, and government property. Therefore, we held in *United States v. Trottier,* 9 MJ 337 (CMA 1980), that most drug offenses should be deemed "service-connected" within the meaning of *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).[1]

In *Murray v. Haldeman,* 16 MJ 74 (CMA 1983), we upheld an order to provide a urine sample, when the order had been given to the servicemember pursuant to a Navy policy that drug tests be performed

---

1. *O'Callahan* was later overruled by the Supreme Court in *Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed. 2d 364 (1987).

on persons reporting in to a naval installation. In our view, the compulsory urinalysis of Murray was "justified by the same considerations that permit health and welfare inspections." 16 MJ at 82. Just as a servicemember's locker could be searched to assure that it did not contain contraband, which would interfere with the military mission, his body fluids could be "seized" to assure his fitness to perform his military duties.

More recently, in *Unger v. Ziemniak*, 27 MJ 349 (CMA 1989), we reiterated our conclusion that compulsory drug testing of servicemembers is constitutionally permissible in order to maintain military effectiveness, regardless of the limitations on such testing in the civilian community. We also suggested that compulsory drug testing already had "performed a significant role" in achieving a dramatic reduction in drug use among servicemembers. *Id.* at 357 n. 16.

Subsequent to our decision in *Unger*, the Supreme Court dealt with compulsory drug testing in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In *Skinner*, the Court upheld, against a Fourth–Amend-

ment challenge, regulations promulgated by the Federal Railroad Administration (FRA) requiring blood and urine tests to be administered to certain railroad employees following major train accidents. In *Von Raab*, by a five-to-four vote, the Supreme Court permitted compulsory urinalysis for some employees of the Customs Service; but at the same time, it made clear that the Government must show why the duties of the employees being tested warranted subjecting them to compulsory urinalysis. *See also National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir., 1989).

We recognize that some distinctions can be drawn between the situations where compulsory drug testing was upheld in *Skinner* and *Von Raab* and the urinalysis program which the armed services have instituted as a means of maintaining military fitness. Justice Kennedy, writing for the majority in *Skinner*, observed:

> The FRA has prescribed toxicological tests, not to assist in the prosecution of employees but rather "to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs."

489 U.S. at ——, 109 S.Ct. at 1415, 103 L.Ed.2d at 639.[2] On the other hand, when

**2.** Justice Kennedy conceded that one provision in the regulations "might be read broadly to authorize the release of biological samples to law enforcement authorities," but he added:

> [T]he record does not disclose that it was intended to be, or actually has been, so used. Indeed, while respondents aver generally that test results might be made available to law enforcement authorities, ... they do not seriously contend that this provision, or any other part of the administrative scheme, was designed as a 'pretext' to enable law enforcement authorities to gather evidence of penal law violations." *New York v. Burger*, 482 U.S. 691, 716–717, n. 27, 107 S.Ct. 2636, 2651, n. 27, 96 L.Ed.2d 601 (1987). Absent a persuasive showing that the FRA's testing program is pretextual, we assess the FRA's scheme in light of its obvious administrative purpose. We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the

administrative nature of the Agency's program.

109 S.Ct. at 1415 n. 5.

In his dissent, Justice Marshall complains:

> To be sure, the majority acknowledges, in passing, the possibility of criminal prosecutions, but it refuses to factor this possibility into its Fourth Amendment balancing process, stating that "the record does not disclose that [49 CFR § 219.211(d) ] was intended to be, or actually has been, so used." This demurrer is highly disingenuous. The Government concedes that it finds "no prohibition on the release of FRA testing results to prosecutors." The absence of prosecutions to date—which is likely due to the fact that the FRA's regulations have been held invalid for much of their brief history—hardly proves that prosecutors will not avail themselves of the FRA's invitation in the future. If the majority really views the impact of FRA testing on privacy interests as minimal even if these tests generate criminal prosecutions, it should say so. If the prospect of prosecutions would lead the majority to reassess the validity of the testing

compulsory drug tests are performed in the armed services as part of a unit "inspection" pursuant to Mil.R.Evid. 313, positive test results are routinely made available for use in criminal prosecutions.

> Justice Kennedy also noted in *Skinner:* The regulations do not require that samples be furnished under the direct observation of a monitor, despite the desirability of such a procedure to ensure the integrity of the sample. See 50 Fed.Reg. 31555 (1985). See also Field Manual B-15; *id.*, at D-1. The sample is also collected in a medical environment, by personnel unrelated to the railroad employer, and is thus not unlike similar procedures encountered often in the context of a regular physical examination.

109 S.Ct. at 1418.

In the armed services, under current directives, urine specimens are obtained from servicemembers—male and female—under direct visual observation.[3] Typically, the urine specimens are obtained from servicemembers in their units or at their work places, rather than "in a medical environment"; and the person collecting the specimens is from the same unit as those who provide the specimens.

In *Von Raab*, the urinalysis tests were upheld by the Supreme Court only as to employees of the United States Customs Service seeking transfer or promotion to positions having a direct involvement in drug interdiction or requiring the employee to carry firearms. 109 S.Ct. at 1390. The Court concluded that the record was inadequate for the purpose of determining whether such testing could constitutionally be required of persons applying "for promotion to positions where they would handle 'classified' information," *id.* at 1398;

and the court of appeals was directed, upon remand, to

> examine the criteria used by the Service in determining what materials are classified and in deciding whom to test under this rubric. In assessing the reasonableness of requiring tests of these employees, the court should also consider pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject.

*Id.* at 1397. Under Mil.R.Evid. 313, on the other hand, servicemembers may be required to provide urine specimens without reference to the military duties they are performing or have been assigned.

█ Despite these differences between drug-testing procedures in the armed services and those upheld in *Skinner* and *Von Raab* and despite the Supreme Court's only limited approval of compulsory urinalysis, we remain convinced that the testing of servicemembers authorized by Mil.R.Evid. 313 pursuant to an "inspection" rationale is constitutionally valid. There are several reasons for our conclusion.

In the first place, as we have emphasized in *Trottier* and *Unger*, servicemembers who are under the influence of drugs often have the potential to do great harm to the military mission and to national security—as well as to other persons and their property. Admittedly, a pilot or a tank operator usually will have a greater potential for harm than a servicemember assigned to a desk job. However, even a servicemember performing far away from active military operations may be operating a computer which processes information vital for those operations. Moreover, in the event of an emergency, a servicemember with a very

program with prosecutions as part of the balance, it should say so, too, or condition its approval of that program on the nonrelease of test results to prosecutors. In ducking this important issue, the majority gravely disserves both the values served by the Fourth Amendment and the rights of those persons whom the FRA searches. Furthermore, the majority's refusal to restrict the release of test results casts considerable doubt on the conceptual basis of its decision—that the "special

need" of railway safety is one "beyond the normal need for law enforcement." 109 S.Ct. at 1431 (citations omitted).

**3.** This Court has held that it is not *per se* unreasonable to obtain urine samples under these circumstances, if the direct observation is performed by someone of the same sex as the servicemember who furnishes a specimen. *Unger v. Ziemniak*, 27 MJ 349, 358 (CMA 1989).

routine job may be called on short notice to perform a more typically "military" task; and his failure to be physically and mentally ready to perform that task may jeopardize national security at the hands of foreign enemies or terrorists.

In *Von Raab,* the Supreme Court upheld the requirement of compulsory urinalysis for employees seeking transfer or promotion to positions which required the carrying of firearms. Certainly not every servicemember has routine access to firearms or other weapons. However, at one time or another many do have such access. Furthermore, the vast majority of servicemembers do have duties which potentially require possession of firearms at a moment's notice. In such event there would probably not be sufficient time to test a member's fitness to handle weapons; hence our more sweeping rule allowing random testing of all hands.

■ Because of its concern about the dangers resulting from use of controlled substances by servicemembers, Congress in Article 112a of the Uniform Code of Military Justice, Pub.L.No. 98–209, § 8, 97 Stat. 1393, 1402 (1983), has specifically forbidden such "use."[4] Moreover, Congress recently has required that new recruits be tested for drug use before going on active duty. 10 USC § 978 (Supp.1990). Of course, legislation cannot override constitutional rights; but, in our view, the legislative judgment that drug use by servicemembers must be eliminated should be given some weight in deciding whether compelling a servicemember to furnish a urine specimen constitutes a reasonable search under the Fourth Amendment.

In *Von Raab,* the majority observed:

We have recognized, however, that the "operational realities of the workplace" may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts.... While these operational realities will rarely affect an employee's expectations of privacy with respect to searches of his person, or of personal effects that the employee may bring to the workplace ... it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches. Employees of the United States Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day. *Similarly, those who join our military or intelligence services may not only be required to give what in other contexts might be viewed as extraordinary assurances of trustworthiness and probity, but also may expect intrusive inquiries into their physical fitness for those special positions.* Cf. *Snepp v. United States,* 444 U.S. 507, 509, n. 3, 100 S. Ct. 763, 765, n. 3, 62 L.Ed.2d 704 (1980); *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974); *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 84, 518 F.2d 466, 477 (1975).

109 S.Ct. at 1393–94 (citations omitted; emphasis added.).

■ The Court's reference here to the "military" services and its citation of *Parker v. Levy, supra,* indicate that the military status of servicemembers may be decisive in establishing that they are subject to routine urinalysis as part of an inspection to determine and maintain readiness. This conclusion would be consistent with *Parker v. Levy, supra,* where the Court held that a servicemember could be subjected to limitations on his freedom of speech that could not be imposed on a civilian.[5]

---

4. The United States Code does not have a prohibition of "use" of controlled substances by civilians. *United States v. Reichenbach,* 29 MJ 128, 138 (CMA 1989).

5. Similarly, in *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), the Supreme Court upheld limitations on a servicemember's freedom of religious expression for which there is no civilian parallel; and in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Supreme Court ruled that servicemembers could not sue for constitutional torts under circumstances where a civilian might have done so.

Of special importance in this context is *Solorio v. United States, supra,* where a majority of the Supreme Court concluded that, simply by reason of his military status, a servicemember is subject to trial by court-martial—without some safeguards available to defendants tried in Federal and state courts—even if the offenses charged have nothing to do with the accused's military duties. The use of a "bright line" test based on military status—rather than the more nebulous test of service connection, which had been relied on in *O'Callahan v. Parker, supra*—provides a precedent for using military status as the criterion in deciding whether compulsory urinalysis is constitutionally permissible. Moreover, this avoids the uncertainty and confusion that characterized the reign of *O'Callahan.*

In *Skinner,* the majority emphasized that the compulsory blood and urine tests were effective as a deterrent [6]—even though the deterrent effect of drug testing on federal employees has not yet been fully demonstrated. On the other hand, the armed services have assembled extensive empirical evidence that compulsory drug testing already has "performed a significant role" in deterring drug use. *See Unger v. Ziemniak,* 27 MJ at 357 n. 16. The most dramatic evidence has been provided by the drastic reduction in positive drug-test results.

Moreover, since the Armed Services instituted compulsory urinalysis, pollsters have confirmed this reduction of use by means of numerous interviews and questionnaires. *See, e.g.,* Bray, "1988 Worldwide Survey of Substance Abuse and Health Behaviors Among Military Personnel," Research Triangle Institute, Dec.1988. Thus, to the extent that its deterrent effect provides any justification for compulsory drug testing, this justification is especially applicable to the testing of servicemembers.

■ The extensive notice that has been given to servicemembers about the drug-testing program is another circumstance tending to establish that compulsory drug tests are reasonable searches. As Justice Kennedy pointed out for the majority in *Von Raab:*

> Only employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions. Employees are also notified in advance of the scheduled sample collection, thus reducing to a minimum any "unsettling show of authority," *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), that may be associated with unexpected intrusions on privacy. *Cf. United States v. Martinez–Fuerte,* [428 U.S. 543] *supra,* 428 U.S., at 559, 96 S.Ct., [3074,] at 3083 [49 L.Ed.2d 1116

---

6. According to Justice Kennedy,

> [w]hile no procedure can identify all impaired employees with ease and perfect accuracy, the FRA regulations supply an effective means of *deterring* employees engaged in safety-sensitive tasks from using controlled substances or alcohol in the first place.

109 S.Ct. at 1419 (emphasis added). He goes on to state:

> Because the record indicates that blood and urine tests, taken together, are highly effective means of ascertaining on-the-job impairment and of deterring the use of drugs by railroad employees, we believe the Court of Appeals erred in concluding that the post-accident testing regulations are not reasonably related to the Government objectives that support them.

109 S.Ct. at 1421 (footnote omitted).

Justice Stevens, concurring in the judgment, commented:

> I am not persuaded, however, that the interest in deterring the use of alcohol or drugs is either necessary or sufficient to justify the searches authorized by these regulations.
>
> I think it a dubious proposition that the regulations significantly deter the use of alcohol and drugs by Hours of Service employees.

109 S.Ct. at 1422.

Justice Marshall, dissenting, criticized "[t]he poverty of the majority's deterrence rationale." 109 S.Ct. at 1432.

In *Von Raab,* the majority also relied on the deterrent effect of drug testing in seeking to justify its constitutionality. *See, e.g.,* 109 S.Ct. at 1395 n. 3. Justice Scalia, in his dissent, expresses doubt as to applicability of the deterrence rationale.

(1976) ] (noting that the intrusion on privacy occasioned by routine highway checkpoints is minimized by the fact that motorists "are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere").
109 S.Ct. at 1394 n. 2.

■ The very detailed regulations and policies established by the armed services for drug testing not only provide notice but also reduce the occasion for arbitrariness and abuse of discretion.[7]

■ Even though the positive results of drug tests usually are available to military prosecutors, we do not believe that requiring servicemembers to submit urine specimens is an unreasonable intrusion. We might take a different view if the drug testing were designed solely to obtain evidence for criminal prosecution; but, as we understand the military drug-testing program, that is not the case. A positive drug test may result in admonitions or adverse administrative action for a servicemember—rather than in criminal prosecution.

The primary objective of the armed services is to assure that servicemembers are physically and mentally fit to perform their military duties—rather than to impose punishment for drug use. This objective is at least as important as the objectives of the administrative inspections authorized by cases like *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

■ Moreover, when the persons to be "inspected" are located in a highly regulated environment, they have a reduced expectation of privacy; and this is a factor in determining the reasonableness of the inspection. *Skinner v. Railway Labor Executives' Association*, 109 S.Ct. at 1418; *New York v. Burger*, 482 U.S. 691, 107

S.Ct. 2636, 96 L.Ed.2d 601 (1987). As we emphasized almost a decade ago in *United States v. Middleton, supra,* those who enter the armed forces realize that, by doing so, they are changing their status materially and that they will enjoy less privacy than before. Thus, we conclude that compulsory urinalysis may be performed as part of a military inspection without any requirement of probable cause or individualized suspicion.

The Supreme Court has not yet held that evidence discovered in a lawful administrative inspection is inadmissible in a criminal prosecution; and we doubt that the Court will ever apply the exclusionary rule to such evidence. Certainly, our Court has not done so—unless "the purported inspection" was "only a subterfuge for a search" for evidence to be used in a criminal prosecution. *See United States v. Thatcher,* 28 MJ 20, 24 (CMA 1989).

■ We also conclude that *Skinner* and *Von Raab* do not require reconsideration of our holding in *Unger v. Ziemniak,* 27 MJ at 357–58, that the armed services may require servicemembers to provide urine specimens under direct visual observation. Admittedly, direct observation is not a part of current programs for the testing of federal employees; and in those programs various alternatives have been developed to prevent the switching or the adulteration of urine specimens to which we adverted in *Unger.* However, we note these comments by the Supreme Court in *Skinner:*

> Respondents offer a list of "less drastic and equally effective means" of addressing the Government's concerns, including reliance on the private proscriptions already in force, and training supervisory personnel "to effectively detect employees who are impaired by drug or alcohol use without resort to such intrusive procedures as blood and urine

---

7. In *Florida v. Wells,* — U.S. ——, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), the majority held that opening a locked suitcase in the trunk of a car could not be upheld as an inventory search because the state highway patrol had no policy with respect to such searches. The Court concluded that "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Id.* 110 S.Ct. at 1635.

**286**

tests." ... We have repeatedly stated, however, that "[t]he reasonableness of any particular government activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983). *See also Colorado v. Bertine,* 479 U.S. 367, 373–374, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987). It is obvious that "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," *United States v. Martinez–Fuerte,* 428 U.S., at 556–557, n. 12, 96 S.Ct., at 3082, n. 12, [49 L.Ed.2d 1116,] because judges engaged in *post hoc* evaluations of government conduct " 'can almost always imagine some alternative means by which the objectives of the [Government] might have been accomplished.' " *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985), quoting *United States v. Sharpe,* 470 U.S. 675, 686–687, 105 S.Ct. 1568, 1575–1576, 84 L.Ed.2d 605 (1985). Here, the FRA expressly considered various alternatives to its drug-screening program and reasonably found them wanting. At bottom, respondents' insistence on less drastic alternatives would require us to second-guess the reasonable conclusions drawn by the FRA after years of investigation and study. This we decline to do.

109 S.Ct. at 1419 n. 9.

Unlike the civilian drug testing involved in *Skinner* and in *Von Raab,* which typically takes place in a medical environment, the obtaining of urine specimens of service-members does not always—or even usually—occur in a clinic or hospital. Indeed, given the wide dispersion of military units and the great number of tests to be performed, it would be much more difficult for the armed services than for civilian agencies to obtain the required urine specimens in a medical environment.

With this in mind, we conclude that use of direct visual observation is a permissible alternative for the armed services to use in order to avoid substitution or adulteration of urine samples that would frustrate the purposes of the drug-testing program.[8]

**B**

Appellant contends that, even if a commander may compel members of his unit selected at random to furnish urine specimens as part of an "inspection," the nonconsensual extraction of urine from Bickel on July 21 does not fit within such a rationale; and that, instead, extraction of his urine at that time was undertaken "for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings." *See* Mil.R.Evid. 313(b). Furthermore, Bickel claims that, because he was a "specific individual[ ] ... selected for examination ... the prosecution must prove by clear and convincing evidence that" obtaining his urine was part of "an inspection." Mil.R.Evid. 313(b).

We agree with appellant that neither Mil.R.Evid. 313 nor the Fourth Amendment permits a military commander to pick and choose the members of his unit who will be tested for drugs and then to use the resulting evidence to obtain a criminal conviction. Instead, the testing must be performed on a nondiscriminatory basis pursuant to an established policy or guideline that will eliminate the opportunity for arbitrariness by the person performing the tests. *Cf. Florida v. Wells,* —— U.S. ——, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). Thus, in *Murray v. Haldeman, supra*—where we upheld the compulsory urinalysis—the members of the class to be tested were newly transferred sailors initially reporting on board. Once this guideline had been prescribed, there was no further discretion to be exercised by any commander.'

---

**8.** As we emphasized in *Unger v. Ziemniak,* 27 MJ 349, 358 (CMA 1989), direct visual observation must itself be conducted in a reasonable manner and not in an oppressive or humiliating way.

The purpose of an inspection is to correct an injurious or dangerous condition. This is true whether the inspection is performed by a civilian building or housing inspector, *cf. New York v Burger, supra; Camara v. Municipal Court, supra,* or is performed by a commander or first sergeant, *cf. United States v. Middleton, supra.* We feel sure that, in civilian life, an inspector who discovers a violation during a routine inspection will return later to the site to determine if the defect has been remedied. We see no reason—theoretical or practical—why a military inspection should be conducted differently.

In short, the inspector, after determining that something is amiss, will not simply call the defect to the attention of those involved and then forget about it. Instead, he usually will—and should—check back to determine if a defect or dangerous condition that he has discovered has been corrected. To some extent, the checking back is a continuation of the original inspection—although admittedly it involves further interference with the privacy of the person whose property is being inspected.

■ The policy letter issued by Bickel's company commander—whereunder servicemembers who had tested positive on a random sweep would be tested again at the time of the next "inspection"—contemplated a continuation of the original inspection. Although Bickel was being subjected to a second compulsory urinalysis only 6 weeks after the first, his original selection was random. There was nothing arbitrary or whimsical about the choice of Bickel to be tested again; instead, the selection was made pursuant to a clear, and generally stated, criterion. From this perspective, he was not a "specific individual[ ] ... selected for examination" within the meaning of Mil.R.Evid. 313(b).

In *Murray v. Haldeman, supra,* naval authorities had acted reasonably in requiring that sailors reporting in after a transfer furnish a urine specimen. Likewise, it was quite rational for Bickel's company commander to determine whether any member of his unit who had tested positive on one occasion—and so was indicated by the test to be unfit for military duty—had corrected his substandard condition.

Moreover, the commander had published his policy before Bickel's first specimen had tested positive—and, indeed, before that first specimen had even been taken. Thus, it is clear that the commander did not promulgate a policy directed toward Bickel or any other specific individual who had been identified by the commander before promulgating the policy. The policy letter was not a trick to justify a search of someone whom military authorities already wished to search.

We realize that, when Bickel provided the second specimen on July 21, it was quite probable that, if this specimen tested positive, he would be court-martialled or subjected to other disciplinary action. Nevertheless, we are unconvinced that even then the commander had "the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings." *See* Mil.R.Evid. 313(b). He was not employing "a subterfuge for a search," either. *See United States v. Thatcher,* 28 MJ at 24.

C

■ Appellant also contends that, even if obtaining his second urine specimen may be encompassed within the definition of an "inspection," use of the positive results of this test in evidence was prohibited by an Army regulation. We accept the premise that the results of a compulsory urinalysis may not be used in a trial by court-martial unless the testing has been done in compliance with regulations designed to assure that the servicemember is not prosecuted because of false positives and that his privacy is protected. If a violation of an applicable regulation significantly impairs either of these purposes, the results of the test will not be admitted. *See, e.g., United States v. Arguello,* 29 MJ 198 (CMA 1989).

Senior Judge Smith, dissenting below, argued persuasively that reception in evidence of the results of Bickel's second test

violated what the panel majority described as "[t]he 'limited use policy' under AR 600–85, para. 6–4*a* (1) [which] prohibits the use of '[m]andatory urine ... test results taken to determine a soldier's fitness for duty and the need for counseling, rehabilitation, or other medical treatment or in conjunction with a soldier's participation in ADAPCP [Alcohol and Drug Abuse Prevention and Control Program].' " 27 MJ at 640 n. 3. Under this policy the results cannot be used if the test was "based on a 'reasonable suspicion that [the] soldier is using a controlled substance.' ..." 27 MJ at 643. *See also* AR 600–85, para. 6–4(a).

The majority in the court below was convinced, however, that this prohibition on use of test results in evidence did not apply because,

[i]n the instant case, as the military judge found, there was no reasonable basis to suspect that appellant had recently ingested marijuana either based on a prior positive urinalysis test from urine collected over 40 days prior to the test in question or on the recent behavior of appellant. The second urinalysis was conducted as a result of a policy previously established by the commander for rescreening those individuals who tested positive the previous month. Thus, the rescreening was not specifically directed at appellant.

27 MJ at 643.

 If the company commander had not issued a policy prior to Bickel's first test, we would be more disposed to accept appellant's argument. However, because that policy had been earlier established and announced, we believe that the second test should be viewed as a continuation of the original inspection, rather than as "based on a 'reasonable suspicion that [the] soldier is using a controlled substance.' ..." 27 MJ at 643. Therefore, the second test did not violate Army directives.

### III

Reception in evidence of the results of the urinalysis performed on the urine specimen which Bickel furnished on July 21, 1987, was authorized by Mil.R.Evid. 313(b); and it did not violate either the Fourth Amendment or applicable Army regulations.

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN concurs.

COX, Judge (concurring):

I write only to indicate that, in my view, the fact that appellant's commander issued the policy prior to the first urinalysis is not determinative, albeit it is good evidence of a legitimate purpose. The question is always whether the urinalysis is a legitimate inspection, a reasonable search, or something else—whether or not such a policy had previously been announced.