UNITED STATES, Appellee,

v.

Steve A. DASKAM, Machinist's Mate
Chief Petty Officer, U.S.
Navy, Appellant.

No. 63,401.
NMCM 88–3710.

U.S. Court of Military Appeals.

Argued April 17, 1990.

Decided Sept. 19, 1990.

For Appellant: *Captain M. K. Schaller,*
USMC (argued); *Major Joseph B. Gilbert,*
USMC (on brief).

For Appellee: *Major Rose Marie Favors,*
USMC (argued); *Commander Thomas W.
Osborne,* JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A special court-martial composed of a
military judge alone convicted appellant,
contrary to his pleas, of two specifications
of absence without leave (1 day) and two
specifications each of wrongfully using am-
phetamines and wrongfully using marijua-
na, in violation of Articles 86 and 112a,
Uniform Code of Military Justice, 10 USC
§§ 886 and 912a, respectively. The judge
sentenced appellant to a bad-conduct dis-
charge and reduction to the lowest enlisted
grade. The convening authority approved
these results,[1] and the Court of Military
Review affirmed in an unpublished opinion.

In this Court, as he has throughout, ap-
pellant challenges the lawfulness of three
urinalyses, the results of which were the

---

1. The court-martial order dated July 26, 1988,
fails to reflect the pleas, as required by RCM
1114(c)(1), Manual for Courts–Martial, United
States, 1984.

essential proof of the specifications of wrongful drug use. 29 MJ 462 (1989). Without reaching the merits of appellant's broadside attack on the claimed basis of these tests—an inspection, *see* Mil.R.Evid. 313, Manual for Courts–Martial, United States, 1984—we conclude that, as applied to appellant under the circumstances of this case, the urinalyses were not legitimate inspections. Thus, the results of the intrusions were inadmissible in appellant's court-martial, and the convictions resulting from this evidence cannot stand.

## I

At the time of his court-martial, appellant was a Chief Petty Officer in the grade of E–7 and had served the Navy with distinction for approximately 15 years, the last 3 as an instructor at Fleet Training Command (FTC) in San Diego.

On February 9, 1988, appellant was 50 minutes late reporting for duty; he was 2 hours late, again, on February 26; and on March 14, 1988, he reported 95 minutes late. Each time he was required to submit a urine sample for testing. On the first occasion, the sample was collected pursuant to a standing verbal order of the commander of FTC, given in December 1987, requiring that everyone returning from unauthorized absence submit such a sample; on the later occasions, the samples were collected under a written order from this commander to the same effect. *See* FLETRACENSDINST 5350.4B, February 19, 1988. On no occasion did appellant consent to this procedure, and his commander did not find probable cause to authorize a search via this procedure.

At his arraignment, appellant moved to suppress the results of the three urinalyses, *see* RCM 905(b)(3), Manual, *supra*, contending that the sample-collection procedures used here "may [not] be characterized as valid inspections pursuant to [Mil.R. Evid.] 313." Both sides earlier had filed written pleadings with the court urging the lawfulness or unlawfulness, respectively, of the procedure as inspections, and both

sides presented evidence and oral argument on the motion.

During the litigation of this motion, testimony established that the command policy contained no exceptions: Everyone returning from an unauthorized absence—no matter who the person or how long the absence—was required to submit a urine sample for analysis. *See* para. 8.a.(3), FLETRACENSDINST 5350.4B. The testimony also established, though, that *every* returning absentee did *not* submit such a sample. As one prosecution witness put it in response to a defense question on cross-examination as to whether "there appear[ed] to be problems" with every absentee submitting a sample, "Yes, sir, it would appear that the chain of command themselves aren't sending their people in." Defense counsel summarized the situation in his argument on the motion in this way: "The bottom line is, sir, it's hit or miss here. We have a command policy that is not being enforced and not being enforced equally to everyone."

Ultimately, the military judge denied the motion to suppress. Rationalizing his ruling, the military judge made the following findings and conclusions:

The court notes that inspections under Military Rules [sic] of Evidence 313 are designed to ensure the military fitness and good order and discipline of a unit, ensuring that assigned personnel are fit and ready for duty; that persons identified as drug abusers obtain counseling or rehabilitation. Selection of service members for urinalysis inspection can include a random selection from any identifiable segment or class, such as, all personnel who surrender or are apprehended after an unauthorized absence.

The Court finds that the accused three times placed himself in this class and that an inspection of his urine was properly ordered and that the inspection was lawful under MRE 313.

Additionally, the court finds there is no evidence that the accused was singled out or targeted for a urinalysis by the Commanding Officer's verbal order and

instruction, nor does the court find that the primary purpose of the order was to identify drug abusers and institute disciplinary action against them.

The fact that certain UA [unauthorized absence] returnees may not have been ordered to report to the Master–at–Arms to provide a urine sample, or that having been so ordered, failed to do so, does not establish that the accused was specifically selected for examination.[2] Different segments of the chain of command were required to order persons returned from UA to provide a sample, and failure to do so or failure to ensure the individuals so ordered did, in fact, provide the sample, does not suggest any more than a failure of some to correctly enforce the CO's orders.

A set group of people were randomly selected by the Commanding Officer to provide urine specimens as part of his overall drug prevention and control program. The inspection was valid pursuant to his instruction [FLETRACENSDINST 5350.4B, *supra*], OPNAV Instruction 5350.4 Alpha, of 27 August 1987, and Military Rules [sic] of Evidence 313.

## II

■ It is now beyond cavil that evidence produced pursuant to a valid inspection under Mil.R.Evid. 313(b) is admissible in a subsequent court-martial as a reasonable intrusion upon a servicemember's privacy. It further is beyond cavil that compulsory random urinalysis is within the scope of Mil.R.Evid. 313's " 'inspection' rationale [and, thus,] is constitutionally valid." *United States v. Bickel*, 30 MJ 277, 282 (CMA 1990). *Accord Unger v. Ziemniak*, 27 MJ 349 (CMA 1989); *Murray v. Haldeman*, 16 MJ 74 (CMA 1983).

The particular urinalyses of appellant are predicated upon Mil.R.Evid. 313 as imple-

mented—down the chain of command—by Department of Defense (DoD) Directive 1010.1 (December 28, 1984); Secretary of the Navy Instruction (SECNAVINST) 5300.28A (January 17, 1984); Chief of Naval Operations Instruction (OPNAVINST) 5350.4A (August 27, 1987); and FLETRACENSDINST 5350.4B, *supra*. Thus, to resolve appellant's complaint that his urinalysis was not within Mil.R.Evid. 313 but was, instead, a subterfuge for a search without probable cause therefor, we begin with an examination of the regulations that implemented the Navy's urinalysis program.

### A. *DoD Directive 1010.1*

In order to carry out DoD policy of "preserv[ing] the health of" servicemembers "by identifying" and treating drug abusers and of permitting commanders to assess and preserve "security, military fitness, and good order and discipline," *see* paras. C.1 and 2, the Directive permits "[m]andatory urinalysis testing for drugs." Such testing may be conducted under four circumstances: (1) "During inspections performed under Military Rule of Evidence 313"; (2) "During a search or seizure action under Military Rules of Evidence 311–317"; (3) "As part of one of" three other specific types of examinations: "(a) A command-directed examination ... of a specific servicemember to determine" his "competenc[e] for duty and the need for ... medical treatment when there is a reasonable suspicion of drug abuse"; (b) one "in conjunction with a servicemember's participation in a DoD drug treatment and rehabilitation program"; (c) one in connection with "a mishap or safety investigation undertaken for the purpose of accident analysis"; and (4) "[a]ny other examination ordered by medical personnel for a valid medical purpose under Military Rule of Evidence 312(f)." Paras. E.1.a.(1)-(4). Results of urinalysis under the third set of circumstances may not be used in courts-

---

**2.** See, however, this testimony of Lieutenant Klister, the Legal Office Department Head, regarding his reaction upon learning of appellant's second instance of being late:

> On this occasion, he was UA on this date. He had called in after 7:30, but his absence wasn't excused. My Master Chief informed me of it and I said, well, he'll submit a urinalysis when he does come in.

martial except for purposes of impeachment or rebuttal. Para. E.2.a.—d.

### B. *SECNAVINST 5300.28A*

Consistent with this DoD Directive, the Secretary of the Navy has "authorized" "[m]andatory urinalysis testing of all officers and enlisted members for controlled substances ... under the following circumstances: a. Inspection—periodic inspections, including unit sweep and random sampling health and welfare inspections, under Military Rule of Evidence 313. b.... a search or seizure under" Mil.R.Evid. 311–17; " c.... any examinations ordered by medical personnel for a valid medical purpose under" Mil.R.Evid. 312(f); or "d. Fitness for duty" tests, which include "command-directed examination[s] ... of a specified member ... when there is a reasonable suspicion of drug abuse, an examination of a specified member incident to a mishap or safety investigation, or an examination of a specified member in conjunction with a member's participation in a drug treatment or rehabilitation program." Para. 3. Also reflective of the Directive, this secretarial instruction limits court-martial use of the results of a "[f]itness for duty" urinalysis to impeachment or rebuttal. Para. 4.

### C. *OPNAVINST 5350.4A*

This instruction, out of the Office of Chief of Naval Operations, authorizes "[m]andatory urinalysis testing for drugs ... in the following circumstances:" (1) inspections under Mil.R.Evid. 313; (2) searches or seizures under Mil.R.Evid. 311, 312, and 314–16; (3) one of three other examinations, namely, "[a] command-directed examination or referral of a *specific* member to determine the member's competency for duty and the need for ... treatment when there is a reasonable suspicion of drug abuse"; "[a]n examination in conjunction with ... participation in a DoD drug ... rehabilitation program," and "[a]n examination" in conjunction with "a mishap or safety investigation" during an "accident analysis"; and "(4) [a]ny other examination ordered by medical personnel for a valid medical purpose under" Mil.R.Evid.

312(f). Paras. 3.a(1)-(4). As with the superior regulatory measures, this instruction prohibits court-martial use of urinalysis results obtained under the third category above except for purposes of "impeachment or rebuttal." Para. 4.a.

Subsequent portions of this instruction describe these circumstances in more detail. Relevant to our inquiry is paragraph 5.b.(1), which authorizes commanders to "order urinalysis inspections just as they may order any other inspection to determine and ensure the security, military fitness, and good order and discipline of the command." As to how the members to be inspected should be selected, subparagraphs (a) and (b) offer two non-exclusive approaches: first, *"[r]andom selection of individual service members either from the entire unit or from any identifiable segment or class of that unit* such as a department, division, work center, watch section, barracks, all non-rated, all officers, or all personnel who have reported for duty in the past month, or similar classes"; or, second, *"[s]election, random or otherwise, of an entire subunit or identifiable segment of a command.* Examples of such groups would include: an entire department, division, or watch section; all personnel within specific paygrades; all newly reporting personnel as they report aboard; or *all personnel who surrender or are apprehended after an unauthorized absence."* (Emphasis added.)

### D. *FLETRACENSDINST 5350.4B*

Referring to the OPNAVINST above, paragraph 6.a. notes that "urinalysis results" may be used at courts-martial "when the ... specimen" has been taken pursuant to "a unit sweep, as a random screening, or as a search based upon probable cause." Paragraph 6.b. observes that similar use may be made of urinalysis results when the specimen has been "collected pursuant to the voluntary consent of an individual." Rounding out the picture, paragraph 6.c. states, in contrast, that the result of a "Command Directed Urinalysis does not fall within the requirements for use at disciplinary proceedings."

Paragraph 7 appears to concern command-directed urinalysis. Specifically, it addresses situations in which "any individual ... manifests some identifiable trait of alcohol or drug abuse and/or involvement in unusual event, accident or incident ..." Para. 7.a. Four subparagraphs then list a number of illustrative instances of events that trigger such concern. All of them parallel similar instances mentioned in paragraph 5.c.(1)(a)-(d) of OPNAVINST 5350.4A with one exception: The latter does not include the former's mention of "unauthorized absence."

Finally, pertinent to our analysis, paragraph 8.a. charges a certain official with responsibility "for overall coordination of unit sweep/random screening evolutions," including "(3) Ensuring that all personnel who surrender or are apprehended after an unauthorized absence submit to a random urinalysis."

### E. *Distillation of Regulations*

Insofar as our focus in this appeal is on mandatory urinalyses as inspections, two points may be distilled from these regulations.

First, all provide for urinalysis as an inspection tool under Mil.R.Evid. 313. This is consistent with the precedent of this Court referred to earlier and with Mil.R. Evid. 313(b) itself which provides, *inter alia,* that "[a]n order to produce body fluids, such as urine, is permissible in accordance with this rule."

Second, while neither the DoD Directive nor the Secretary of the Navy Instruction is more detailed as to such inspections, both the OPNAVINST and the FLETRACENSDINST are. Specifically, the former mentions "all personnel who surrender or are apprehended after an unauthorized absence" as an example of an "identifiable segment of a command" that may be "[s]elect[ed], random or otherwise," for urinalysis inspection. Para. 5.b.(1)(b), OPNAVINST, *supra.* Furthermore, the latter particularly charges a certain official with responsibility for "[e]nsuring that all" such

returning unauthorized absentees "submit to a random urinalysis." Para. 8.a.(3), FLETRACENSDINST, *supra.*

Thus, our inquiry may be narrowed as follows: If Mil.R.Evid. 313 permits identifying all unauthorized absentees as a segment of a command that may be subjected to random compulsory urinalysis when they "surrender or are apprehended," [3] was appellant properly included within such a segment under the circumstances of this case?

### III

Both DoD Directive 1010.1 and SECNAVINST 530.28A recognize three categories of mandatory urinalysis. One of these is "command directed" urinalysis to determine a specific servicemember's competence for duty and need for medical treatment. Compulsory urinalysis of this type is based on "reasonable suspicion of drug abuse"; and the evidence derived therefrom may be used in a court-martial only for purposes of impeachment or rebuttal.

Because of the hierarchical structure of our Nation's military establishment, a Department of Defense directive binds the Secretary of Navy in issuing instructions; an Instruction from the Secretary of the Navy binds the Chief of Naval Operations in his issuance of instructions; and the Instructions of the Chief of Naval Operations bind subordinate commands. Thus, neither the Chief of Naval Operations nor any subordinate commander is free to issue instructions which—directly or indirectly— permit evidence obtained by a "command-directed" urinalysis to be used by the Government in a court-martial as part of its case-in-chief.

Appellant contends that FLETRACENSDISNT 5350.4B, and OPNAVINST 5350.4A violate this limitation. Appellate defense counsel theorizes that, when an unauthorized absentee is selected for compulsory urinalysis, the rationale for doing so is that his absence creates "a reasonable suspicion" that he was using drugs, because

---

**3.** As indicated at the outset of this opinion, we    do not now consider this broader question.

drug use in the Armed Services often has led to chronic absenteeism. Thus, when Naval authorities create "groups" composed of persons "who surrender or are apprehended after an unauthorized absence" and subject the members of those groups to "inspections" by means of compulsory urinalysis, they are misusing the power to conduct health-and-welfare inspections and are evading the limitations that have been imposed on the use of evidence derived from "command-directed" urinalysis. Indeed, the defense inquires whether Naval commanders could completely eliminate the evidentiary limitations of DoD Directive 1010.1 by authorizing mandatory urinalysis as a means of "inspecting" "groups" composed of those persons as to whom "there is a reasonable suspicion of drug abuse."

The Government responds that compulsory urinalysis of unauthorized absentees falls within the purview of "inspections" under Mil.R.Evid. 313 and is fully authorized by our precedents. It draws an analogy between the regulations of concern in this case and the command policy which the Court upheld in *Murray v. Haldeman, supra*. There, all newly reporting school personnel were subjected to urinalysis; and we concluded that "[c]ompulsory urinalysis under the circumstances of [that] case is justified by the same considerations that permit health and welfare inspections." 16 MJ at 82. In discussing this holding very recently, we reasoned: "Just as a servicemember's locker could be searched to assure that it did not contain contraband, which would interfere with the military mission, his body fluids could be 'seized' to assure his fitness to perform his military duties." *United States v. Bickel*, 30 MJ at 281. Indeed, in *Bickel*, we concluded that, within the inspection rationale under Mil.R.

Evid. 313, a commander could properly direct that any servicemember who tested positive in a urinalysis conducted pursuant to random selection could be tested again when there was another random selection urinalysis of the members of his unit.

Appellant replies that, even if the Government was generally correct in its contention, mandatory urinalysis of unauthorized absentees could be upheld only if it were done uniformly. The established policy purported to be that *all* surrendering and apprehended absentees were to be tested; but this guideline was not followed. As appellant contends, this Court has insisted that compulsory urinalysis be conducted pursuant to preestablished guidelines rather than at the discretion of a commander. *See, e.g., id.* at 286; *cf. Florida v. Wells*, —— U.S. ——, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).[4] Moreover, as we noted in *Murray v. Haldeman, supra*, the petitioner there "was not singled out in any way for the urinalysis." 16 MJ at 82. *See also* Mil.R.Evid. 313.

The issues posed by appellant are significant. However, they need not be resolved in this case because we conclude that, even assuming *arguendo* the legality of the directives that appellant has attacked, they never were intended to apply to Daskam.

■ There is considerable logic in the proposition that compulsory urinalysis is a "health-and-welfare inspection" to determine the fitness for duty of unauthorized absentees who return to military control, *see Murray v. Haldeman, supra*. The logic of such testing, however, dissipates when applied to a servicemember who has been an "unauthorized absentee" for a period ranging variously from less than 1 or 2 hours. Such an individual has not truly been beyond military control in any mean-

---

**4.** In *Florida v. Wells*, —— U.S. ——; 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), the Supreme Court held that, in the total absence of any standard policy addressing police inventory searches, the state police had too much discretion in the conduct of such searches for them to be reasonable. *See Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v.*

*Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Where there *is* a standard policy, as in this case, but where it is applied willy-nilly, there would appear to be equal constitutional difficulties—especially where the application in the case at bar arguably was a pretext in order to accomplish another end. *Cf. United States v. Thatcher*, 28 MJ 20 (CMA 1989).

ingful sense; and he has not truly "surrendered or been apprehended." Daskam's reporting an hour or 2 late for work smacks more of "failure to go" or, conversely, "going from" his appointed place of duty, than of absenting himself from his unit, organization, or place of duty. *Compare* Art. 86(1) and (2) *with* Art. 86(3), UCMJ, 10 USC § 886(1), (2), and (3).

Because of the constitutional and other issues that OPNAVINST 5350.4A poses if we give it the sweeping interpretation for which the Government argues, we reject that interpretation. Instead, we conclude that this directive was not intended to encompass someone like appellant—who has neither "surrendered" nor been "apprehended" as an unauthorized absentee from military control—but who instead simply failed to go to his appointed place of duty. If necessary, in some later case, we can grapple with the broader issues that appellant has raised here.

IV

The decision of the United States Navy–Marine Corps Court of Military Review is reversed as to Charge II and its specifications and the sentence. The findings of guilty of Charge II and its specifications are set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court, which may set aside the sentence and order a rehearing on the affected offenses and the sentence, if there be any untainted evidence available; or it may dismiss the affected offenses and reassess the sentence based on the remaining findings of guilty.

Judges COX and SULLIVAN concur.