UNITED STATES, Appellant,

v.

Audrey J. VALIGURA, Private,
U.S. Army, Appellee.

No. 99–5005.
Crim.App. No. 9800225.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 16, 1999.

Decided Sept. 25, 2000.

Sullivan, J., filed concurring opinion.

Gierke, J., filed opinion concurring in part and dissenting in part.

Crawford, Chief Judge, filed dissenting opinion.

EVERETT, S.J., delivered the opinion of the Court, in which SULLIVAN and EF-FRON, JJ., joined. SULLIVAN, J., filed a concurring opinion. GIERKE, J., filed an opinion concurring in part and dissenting in part. CRAWFORD, C.J., filed a dissenting opinion.

For the Accused: *Captain Sean S. Park* (argued); *Colonel Adele H. Odegard, Major Scott R. Morris,* and *Major Jonathan F. Potter* (on brief).

For the United States: *Captain Joseph A. Pixley* (argued); *Colonel Russell S. Estey* (on brief); *Lieutenant Colonel Eugene R. Milhizer.*

Senior Judge EVERETT delivered the opinion of the Court.

Private Valigura (hereafter appellee) was tried by a general court-martial consisting of a military judge alone. Contrary to her pleas, she was convicted of conspiracy to distribute marijuana and failure to go to her appointed place of duty; pursuant to her pleas, she was convicted of failure to obey a lawful order and wrongful distribution of marijuana. *See* Arts. 81, 86, 92, and 112a, Uniform Code of Military Justice, 10 USC §§ 881, 886, 892, 912a, respectively. The sentence as approved by the convening authority was a bad-conduct discharge, confinement for 6 months, total forfeitures, and reduction to Private E–1.

This appeal concerns only the conspiracy charge and seeks an answer to this issue certified by the Judge Advocate General:

> WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED BY HOLDING THAT APPELLEE'S CONSPIRACY CONVICTION UNDER ARTICLE 81, UNIFORM CODE OF MILITARY JUSTICE, MUST BE SET ASIDE BECAUSE THE EVIDENCE SHOWED THAT HER SOLE CO–CONSPIRATOR WAS AN UNDERCOVER GOVERNMENT AGENT, WHERE THE AGENT ACTUALLY AGREED WITH APPELLEE TO DISTRIBUTE ILLEGAL DRUGS, BUT DID SO FOR A LAW ENFORCEMENT RATHER THAN A CRIMINAL PURPOSE.

We hold that the Court of Criminal Appeals ruled correctly for the reasons expressed in the majority opinion by Judge Trant. 50 MJ 844 (1999).

I

The facts are not unusual. Private Valigura agreed to sell marijuana to an undercover military police investigator; and pursuant to this agreement, she received payment upon delivery of the drug. The only two co-conspirators named in the conspiracy specifica-

tion are Valigura and the undercover investigator. Everything said and done by that investigator indicated a concurrence of purpose with that of Valigura; and the action of the two persons would also have suggested to any observer that an agreement had been reached.

Even so, under the traditional "bilateral" theory, the crime of conspiracy had not been committed by either the undercover investigator, who lacked *mens rea*, or by Valigura, even though she clearly possessed a purpose to enter into an agreement to sell marijuana. She could not be guilty because no one can be found guilty of conspiracy unless more than one person has the necessary mental state.

For decades most courts have followed this view, which was well expressed by Justice Cardozo in *Morrison v. California:*

> It is impossible in the nature of things for a man to conspire with himself. In California as elsewhere conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each.

291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664 (1934)(footnote omitted).

Four decades later the Supreme Court reaffirmed the need that more than one person agree on the criminal goal to be attained. In *Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), it stated that "agreement is the essential evil at which the crime of conspiracy is directed" and it "remains the essential element of the crime." If there is no actual agreement or "meeting of the minds" there is no conspiracy. *See W.* LaFave & A. Scott, *Substantive Criminal Law* § 6.4(d) at 70–71 (1986).

■ Accordingly, if one person is only feigning a criminal purpose and does not intend to achieve the purported purpose, there is no conspiracy.[1] As this Court has said: "[I]t is well settled that there can be no

---

**1.** The same logic would suggest that if two persons purport to enter a conspiracy but because of a mental disease one of them is unable to know right from wrong with respect to the goal of their

agreement, neither person is guilty of conspiracy. But *cf. United States v. Tuck,* 28 MJ 520 (ACMR 1989). In any event, we need not decide that question, which has not been briefed or argued.

conspiracy [Art. 81] when a supposed participant merely feigns acquiescence with another's criminal proposal in order to secure his detection and apprehension by proper authorities." *United States v. LaBossiere*, 13 USCMA 337, 340, 32 CMR 337, 340 (1962).

In the federal courts, a conspiracy conviction still requires at least two persons who genuinely wish to accomplish the ostensible goal of the purported conspiracy. In *Sears v. United States*, 343 F.2d 139, 142 (5th Cir.1965), the Court of Appeals stated that "it takes two to conspire, [therefore] there can be no indictable conspiracy with a government informer...." The *Sears* rule has been followed by seven other Federal circuits.[2] Many, if not most, state courts take the same approach.[3] Why then does any issue of law exist as to the need that more than one person share the criminal purpose?

## II

■ Perhaps the chief reason for raising an issue is provided by the Model Penal Code of the American Law Institute. Under the "unilateral" theory of conspiracy adopted by the Institute, someone may be punished as a conspirator who believes he or she has agreed with another to commit a crime, even though the other person had no purpose to commit that crime. This theory comports with the greater emphasis of the Model Penal Code on an actor's subjective intent than is demonstrated by some other criminal codes. Likewise, under the Model Penal Code, a defendant may be convicted of attempt or conspiracy even though the intended crime was impossible of accomplishment.

Similarly, in prescribing the elements of the crime of attempt, the Model Penal Code asks whether the accused committed an act that was "a substantial step in a course of conduct planned to culminate in [the accused's] ... commission of the crime." § 5.01(1)(c). In turn, the Model Code defines a "substantial step" as conduct that "is strongly corroborative of the actor's criminal purpose." § 5.01(2). This approach allows someone with a clear criminal purpose to be convicted of attempt on the basis of conduct that traditionally may have been viewed as only "preparation."

Military justice has taken some positions parallel to the Model Penal Code. For example, the test used at a court-martial to determine whether an accused's conduct constituted an attempt is whether the accused committed "an overt act which directly tend[ed] to accomplish the unlawful purpose." Para. 4c(1), Part IV, Manual for Courts–Martial, United States (1998 ed.). "The overt act required goes beyond preparatory steps and is a direct movement toward the commission of the offense." Para. 4c(2). Even though military law requires more than mere preparation, a court-martial may convict of attempt on evidence that might be insufficient in some jurisdictions. Likewise, in military justice, impossibility—whether of law or fact—is no defense in a prosecution for conspiracy or attempt. *United States v. Thomas*, 13 USCMA 278, 32 CMR 278 (1962). Accordingly, it seems plausible to argue that military justice should also follow the Model Penal Code in rejecting the "bilateral" in favor of the "unilateral" theory.

Moreover, it has been suggested that implicitly this Court already has embraced the unilateral theory in *United States v. Garcia*, 16 MJ 52 (1983), where we ruled that an

**2.** *See, e.g., United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir.1977); *United States v. Chase*, 372 F.2d 453, 459 (4th Cir.), *cert. denied*, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967); *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Moss*, 591 F.2d 428, 434 n. 8 (8th Cir.1979); *United States v. Escobar de Bright*, 742 F.2d 1196, 1200 (9th Cir.1984); *United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir.1985); *United*

States v. Tombrello, 666 F.2d 485, 490 n. 3 (11th Cir.1982).

**3.** *See, e.g., People v. Foster*, 99 Ill.2d 48, 75 Ill. Dec. 411, 457 N.E.2d 405 (1983); *James v. State*, 481 So.2d 805 (Miss.1985); *State v. Kihnel*, 488 So.2d 1238 (La.Ct.App.1986); *Commonwealth v. Themelis*, 22 Mass.App.Ct. 754, 498 N.E.2d 136 (1986); *Fortune v. Commonwealth*, 12 Va.App. 643, 406 S.E.2d 47 (1991); *State v. Pacheco*, 125 Wash.2d 150, 882 P.2d 183 (1994); *State v. Villalobos*, 120 N.M. 694, 905 P.2d 732 (1995).

accused could be convicted of conspiracy, even though in a different trial the only other alleged conspirator had been acquitted. Indeed, then-Judge Crawford reasoned to this effect in her subsequent opinion in *United States v. Anzalone*, 43 MJ 322 (1995).

## III

Whatever the persuasiveness of these contentions, we must today reject the unilateral theory. In the first place, the various separate opinions in *Anzalone* made clear that the other four judges rejected then-Judge Crawford's view as to the impact of *Garcia*. Thus, it seems clear that *Garcia* was predicated on the well-established premise that totally inconsistent results may be reached in different trials. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Indeed, even in the same trial, a jury may render inconsistent verdicts as to different defendants, *see United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943); and the same rule has been applied with respect to inconsistent judgments entered by a judge as to different defendants, *Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981). So far as we can determine, such decisions by the Supreme Court have not been construed to mean an abandonment of the "bilateral" theory of conspiracy in the federal courts.

Second, unlike the Model Penal Code, the Uniform Code in Article 81 used only the word "conspires"—a word which had been repeatedly construed to require a common criminal purpose by at least two persons. On the other hand, in defining conspiracy in § 5.03, the Model Penal Code uses the word "agrees"—a term which in civil contractual litigation has sometimes been interpreted to include situations where certain actions of the parties indicated they had made an agreement—even if subjectively they were not in full accord. In drafting Article 81 of the Uniform Code, if Congress had wished to adopt such an approach, presumably they would have used "agrees" or some similar word to make the point and not have used only the word "conspires"—which has consistently been interpreted by the federal courts to incorporate a bilateral theory.[4] For this Court retroactively to introduce an entirely new theory of conspiracy that was not contemporaneously in the minds of the legislators or discussed by them would seem to cross the line between judicial interpretation and improper judicial lawmaking and cannot be justified by the "public policy" considerations advanced in Chief Judge Crawford's dissent.

Chief Judge Crawford emphasizes the harm to military efficiency that results when servicemembers engage in drug use and concludes therefrom that this Court should adopt the unilateral theory of conspiracy to help deter drug use. Of course, if we took her approach, the unilateral theory would have to be applied not only to drug conspiracies but also to any other conspiracy prosecuted under Article 81 of the Code and so the resulting change would exceed the scope of the rationale she suggests. More important, we are sure that drug use is of great concern not only in the military but also in the civilian community, and it has been subjected there to severe penalties. For example, in enacting 21 USC § 846, which concerns drug conspiracies, Congress omitted the requirement of an overt act, a requirement which is still included in the general conspiracy statute, 18 USC § 371, as well as in Article 81 of the Code.[5] Nonetheless, in dealing with drug-abuse prevention, Congress has not yet

---

4. Indeed, this Court has followed the Model Penal Code as to issues such as whether "substantial step" satisfies the requirement for attempt or whether "impossibility" is a defense for attempt or conspiracy—issues as to which the federal courts had not articulated clear precedents.

5. In line with decisions of the lower federal courts, the Supreme Court interpreted 21 USC § 846 to have deleted the overt-act requirement. *See United States v. Shabani,* 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). In so doing, the Court followed "the settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." *Id.* at 13, 115 S.Ct. 382. That principle also seems to apply in deciding the issue posed in the case at hand.

adopted the unilateral theory of conspiracy. Thus, 21 USC § 846, which deals specifically with drug conspiracies, does not incorporate the unilateral theory. Certainly by the time this statute was enacted in 1970—some years after promulgation of the Model Penal Code—Congress was aware of the "unilateral" theory of conspiracy, and its failure then to adopt this theory is an added indication that it still favored the "bilateral" theory.

Article 36(a), UCMJ, 10 USC § 836(a), provides that, in prescribing "procedures, including modes of proof," before courts-martial, the President may prescribe regulations "which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts." The implication is that Congress intended that, to the extent "practicable," trial by court-martial should resemble a criminal trial in a federal district court. Even though Article 36 is principally concerned with "procedures" and "rules of evidence," it can be inferred that, unless there is a reason not to do so, an interpretation of a provision of the Uniform Code should follow a well-established interpretation of a federal criminal statute concerning the same subject. The bilateral theory of conspiracy is consistently followed in those courts, and the dissent fails to demonstrate that Congress intended for courts-martial to apply in conspiracy cases a theory that makes it easier to convict than if the prosecution took place in a federal district court.

Throughout her dissent, Chief Judge Crawford makes no reference to the intention of Congress. On the contrary, she makes clear her desire to use the power of this Court to change military law unilaterally to meet the "changing conditions in the military society." 54 MJ at 199. We, however, do not believe it is proper to arrogate to this Court the policy-making prerogative that belongs to Congress. Our role should be to interpret and apply faithfully the policy of Congress in responding to drug offenses or other crimes, regardless of our own view as to the wisdom or efficacy of that policy.

Finally, rejection of the unilateral theory does not leave a significant loophole for harmful conduct. This Court has recognized the crime of attempted conspiracy—the offense which the court below affirmed as a lesser-included offense.[6] For an attempt, the Manual for Courts–Martial prescribes "the same maximum punishment authorized for the commission of the offense attempted, except that in no case should the death penalty be adjudged, nor shall any mandatory minimum punishment apply; and in no case, other than attempted murder, shall confinement exceeding 20 years be adjudged." *See* para. 4e, Part IV. Thus, usually—as in this case—successful invocation of the bilateral theory will have little or no effect on the maximum punishment imposable.[7]

Therefore, in view of well-established precedent and the lack of any indication from the legislative history that Congress intended in 1950 to take a new approach to conspiracy, we uphold the conclusion reached by the court below in its excellent opinion. Thus, we reject the unilateral theory of conspiracy. However, Congress, if it so chooses, can readily overrule our conclusion and adopt a "unilateral" theory of conspiracy. In that event, it would seem likely that, in the interest of consistency, Congress would also wish to amend 18 USC § 371 and 21 USC § 846.

## IV

■ The certified question, which asks if the court below erred, is answered in the negative.

The decision of the United States Army Court of Criminal Appeals setting aside the

---

6. Judge Gierke has disagreed with the Court's view that military justice recognizes an offense of attempted conspiracy. *See United States v. Riddle,* 44 MJ 282, 289 (1996) (dissenting); *United States v. Anzalone,* 43 MJ 322, 326 (1995) (concurring in the result). Even under his view, the offense of solicitation would be available for consideration by a prosecutor.

7. Of course, whether a conspiracy exists may have implications as to vicarious liability and as to admissibility of statements under the hearsay exception.

conspiracy conviction but upholding a conviction for attempted conspiracy is affirmed.

SULLIVAN, Judge (concurring):

I agree with my Brother Judge Everett's excellent and well-reasoned opinion. I write separately to make two points. First, ten circuits have adopted the bilateral theory of conspiracy. *See, e.g., United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir.1993). Second, our rejection today of the unilateral theory of conspiracy is supported by our previous holding that an attempt to conspire is an offense punishable under the Uniform Code of Military Justice. *See United States v. Riddle*, 44 MJ 282, 285 n. * (1996). Accordingly, no loophole exists for prosecuting persons in appellant's situation. *See United States v. Lawrence*, 47 MJ 75 (Summary Disposition June 17, 1997).

GIERKE, Judge (concurring in part and dissenting in part):

I agree with the majority that appellee was not guilty of conspiracy. For the reasons set out in my separate opinion in *United States v. Anzalone*, 43 MJ 322, 326 (1995), I disagree with the majority's holding that appellee was guilty of attempted conspiracy.

Unlike *Anzalone*, I cannot concur in the result in this case, because the specification and the evidence will not support a conviction of solicitation. The testimony of the undercover agent establishes that appellee did not solicit the agent to commit a crime. To the contrary, the agent solicited appellee.

I would reverse so much of the lower court's decision as affirms a conviction of attempted conspiracy and remand the case for sentence reassessment.

CRAWFORD, Chief Judge (dissenting):

The central issue in this case is whether appellee can be convicted of conspiracy if her sole coconspirator was an undercover government agent. The coconspirator's status as an undercover agent is problematic because his lack of intent to complete the substantive offense calls into question the existence of an agreement, which is an essential component of the crime of conspiracy. This Court, taking a bilateral approach to conspiracy, holds that the conviction of the defendant should be overturned because there was in fact no agreement. I dissent. The Uniform Code of Military Justice, the Manual for Courts–Martial, military case law, and public policy all support a unilateral approach to conspiracy that determines whether there was an agreement based on the perspective of the defendant only. Because appellee believed that she had entered into an agreement to sell marijuana, she should be convicted of conspiracy.

## I. The Issue

Conspiracy, like all crimes, is defined by the defendant's *mens rea* and *actus reus*, the defendant's mental state, and the act performed. The *mens rea* required for conspiracy includes both the conscious purpose to conspire and the conscious purpose to commit the substantive offense. The *actus reus* of conspiracy is the agreement that is formed between or among coconspirators.[1]

The element of *mens rea* is clearly satisfied in this case. Appellee had both the intent to conspire and the intent to commit the substantive offense—to sell marijuana. The element of *actus reus*, however, is problematic. Did the parties actually make an agreement if the sole coconspirator did not intend to follow through with the substantive offense? In other words, did the coconspirator's intentional deception of appellee destroy the *actus reus* of the alleged conspiracy?

The answer depends on the definition of "agreement." Traditionally, an "agreement" is bilateral, requiring that at least two parties involved in a conspiracy sincerely intend to complete the substantive offense. An alternative approach relies upon a unilateral definition. Under this approach, the "agree-

---

1. While "the law does not punish criminal thoughts," the Court noted in *United States v. Shabani*, 513 U.S. 10, 16, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), that "the criminal agreement itself is the *actus reus*." As the Court stated in *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."

ment" element is satisfied if the defendant himself believes that there is an agreement. A conspiracy conviction will stand despite a coconspirator's concealed intent not to follow through with the substantive offense.

Which approach, the bilateral or the unilateral, should prevail in military justice?

## II. The Law

### A. A Bilateral Past

The United States Code section on conspiracy, 18 USC § 371, takes a bilateral approach to the crime. This means that for an agreement to be found, both parties must intend to commit the substantive offense. Cases interpreting this section have highlighted the significance of a common design or purpose and a meeting of the minds. "The essence of the crime is the agreement on the part of each party to effect the object involved. They must each intend the accomplishment of the object; and they must agree on this." *United States v. Markowitz*, 176 F.Supp. 681, 684 (E.D.Pa.1959); *see also United States v. Goss*, 329 F.2d 180 (4th Cir.1964). Other cases have clarified that it takes two parties to conspire. Thus, "there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." *Sears v. United States*, 343 F.2d 139, 142 (5th Cir.1965). One defendant alone cannot be convicted of conspiracy.

The drug conspiracy statute, 21 USC § 846, emphasizes that no conspiratorial agreement exists unless at least two culpable coconspirators agree. Consequently, defendant's agreement must be with someone other than a government agent or informant. Therefore, in *United States v. Rodriguez*, 765 F.2d 1546, 1552 (11th Cir.1985), the court held that neither an informant nor an agent of the Drug Enforcement Administration could be considered a party to an "illegal agreement since government agents and in-

formers cannot be conspirators." *See also United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir.1994).

Older military cases seem to mirror the bilateral perspectives of 18 USC § 371 and 21 USC § 846. *See United States v. Nathan*, 12 USCMA 398, 30 CMR 398 (1961); *United States v. Kidd*, 13 USCMA 184, 32 CMR 184 (1962); *United States v. LaBossiere*, 13 USCMA 337, 32 CMR 337 (1962). The majority points in addition to two Supreme Court decisions that embraced the bilateral approach to conspiracy, namely *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), and *Morrison v. California*, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934).

### B. A Unilateral Shift

The ALI Model Penal Code, by contrast, follows a unilateral approach to conspiracy and evaluates the agreement from the perspective of the defendant only. If the defendant believed that there was an agreement, then there was in fact an agreement, regardless of the true intentions of the coconspirator. This is consistent with the Model Penal Code's general view that an analysis of any alleged criminal behavior should consider the circumstances as the defendant believed them to be.

The Uniform Code of Military Justice is, of course, the primary authority in military law. The Code mirrors the Model Penal Code in several respects. First, as the majority points out, the "substantial step" test is the test applied in a court-martial to determine whether an accused's conduct will support a conviction of attempt. *See* Art. 80, UCMJ, 10 USC § 880(a). This is compatible with the Model Penal Code's standard (§ 5.01(1)(c)) for finding an attempt.[2] Second, as the majority also notes, the Code has rejected impossibility of fact as a defense to

2. It should be mentioned, however, that the Manual for Courts–Martial does state that mere preparation does not constitute a substantial step toward the substantive offense. *See* para. 4c(2), Part IV, Manual for Courts–Martial, United States (1998 ed.). This does reflect the Model Penal Code's claim that "[c]onduct shall not be held to constitute a substantial step ... unless it is strongly corroborative of the actor's criminal purpose." Model Penal Code § 5.01(2). According to both authorities, something greater than mere preparation is required for "attempt" because mere preparation is not necessarily "strongly corroborative" of the actor's criminal intent.

conspiracy or attempt. Not only is this consistent with the Model Penal Code's view on factual impossibility (§ 5.01(1)(a)), but it conceptually supports a unilateral approach to conspiracy. A coconspirator's concealed resolve not to follow through with a substantive offense is really just a form of factual impossibility. Finally, the language of Article 81 of the Code resembles Model Penal Code § 5.03 more so than the language of 18 USC § 391. Thus, as the majority concludes, it seems plausible to argue that military justice should also follow the Model Penal Code in favoring the unilateral approach to conspiracy.

The Uniform Code of Military Justice is the principal authority in military law. Also persuasive is the non-binding language of the Manual that clearly supports a unilateral approach to conspiracy. For example, according to the Manual, "[a] person who purposely engages in conduct which would constitute" a substantive offense is guilty of an attempt "if the attendant circumstances were as that person believed them to be." Para. 4c(3), Part IV, Manual for Courts–Martial, United States (1998 ed.). Regarding conspiracy, the Manual provides: "It is not a defense that the means adopted by the conspirators to achieve their object, if apparently adapted to that end, were actually not capable of success, or that the conspirators were not physically able to accomplish their intended object." Para. 5c(7), Part IV. By analogy, the fact that the sole coconspirator is an undercover agent who has no intention of completing the substantive offense would not be a defense to conspiracy.[3]

3. Criminal statutes, such as the Uniform Code of Military Justice, are commonly criticized. It is often argued that criminal statutes are ambiguous, that there are simply too many offenses covered, and finally that there is no notice to potential criminals of the statute's contents. These general criticisms do not apply to the criminal statutes relevant to this case.

4. The lower court majority argued that the reasoning in *Garcia* is not applicable to this case because *Garcia* dealt only with the limited question of consistency of verdicts, and should therefore not be expanded to apply to a general analysis of conspiracy cases. *See* 50 MJ 844, 846.

In addition to the statutory and Manual support for the unilateral approach, military case law in more recent years has embraced the unilateral approach to conspiracy. In *United States v. Garcia*, 16 MJ 52 (1983), this Court faced the question of inconsistency of verdicts and ruled that an accused could be convicted of conspiracy despite the fact that in a different trial, the only other alleged coconspirator had been acquitted. *Garcia* supported an individualized inquiry into the circumstances of the defendant, a perspective that mirrors the unilateral approach to conspiracy. In *United States v. Tuck*, 28 MJ 520, 521 (ACMR 1989), the service court concluded that *Garcia* expressly "rejected the bilateral concept of conspiracy ... in favor of the unilateral theory."[4] (Internal quotation marks omitted.)

Several non-military cases also favor the unilateral approach to conspiracy. In *Harris v. Rivera*, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530(1981), the Supreme Court held that a codefendant's acquittal is not necessarily inconsistent with a defendant's conviction for conspiracy. *See also United States v. Dotterweich*, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *State v. St. Christopher*, 305 Minn. 226, 232 N.W.2d 798 (1975); *Platt v. State*, 143 Neb. 131, 8 N.W.2d 849, 856 (1943). Each defendant is evaluated on the basis of his own independent circumstances. This reasoning would allow a defendant to be convicted of conspiracy, even if a coconspirator's status as an undercover agent prevented the coconspirator's own conviction.

The court cited *United States v. Anzalone*, 43 MJ 322, 328 (1995), in which Judge Wiss, concurring in the result, wrote that *"Garcia* did not change the substantive law that a conspiracy in military jurisprudence requires a meeting of the minds." Thus, the lower court rejected the *Tuck* court's broad reading of *Garcia*, 50 MJ at 846–47. However, Judge Squires wrote in dissent: "A failure to embrace the Model Penal Code's unilateral approach to conspiracy prosecution is not tantamount to an outright rejection of the theory, especially when the issue was not case dispositive. In short, *Anzalone* did not overrule *Tuck*, nor, in my judgment, weaken its holding." *Id.* at 849.

Finally, "ordinary contract law" supports a unilateral approach.[5] Contract law is particularly relevant to a conspiracy analysis because the agreement required for a conspiracy in many ways resembles a contract. Several cases have held that the assent required for the formation of a contract is a matter of overt acts and expressions, and not of inward unanimity in motives, design, or the interpretation of words.[6] Other cases have noted that "[t]the meeting of minds which is essential to the formation of a contract is not determined by the secret intentions of the parties," but rather by the intentions each party outwardly manifests to the other.[7]

These common-law views on contract creation can be applied to conspiracy analysis. In making an agreement to commit a crime, the conspiring parties are, in effect, making a contract. The defining elements of contract formation—namely: offer, acceptance, and consideration—are present.[8] It follows that the agreement, or contract, formed between coconspirators should be evaluated based on the outward manifestations, not the inward intentions, of the parties. The outward manifestations of the parties in the present case reveal an agreement between them to sell and purchase drugs. According to contract law, this is the basis on which the existence of a conspiracy should be evaluated. The concealed motives of the undercover agent do not change the fact that his overt behavior indicated his agreement to buy drugs from appellee.

### III. Public Policy

Policy considerations provide what is perhaps the most compelling support for recognizing the unilateral approach to conspiracy.[9]

In *Sauer v. United States,* 241 F.2d 640, 648 (9th Cir.1957), the court stated that the purpose of criminal law is to define socially intolerable conduct and to hold conduct within the limits which are reasonably acceptable from a social point of view. In short, criminal law aims to punish and deter socially undesirable behavior.

Several rationales are offered for the existence of conspiracy as a specific crime. First, conspiracy is an inchoate crime centered on the preparation to commit a substantive offense.[10] This "inchoate nature" rationale demands that society permit preventive steps to be taken against those who show a disposition to commit crime.[11] More prominent than the "inchoate nature" rationale is the idea that conspiracy entails special dangers inherent in group criminal activity. *See United States v. Feola,* 420 U.S. 671, 693, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Psychological reinforcement, effectiveness, degree of harm, and the creation of a focal

---

5. *See Anzalone,* 43 MJ at 326 (opinion of Crawford, J.).

6. *See Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516 (1954); *Washington Shoe Mfg. Co. v. Duke,* 126 Wash. 510, 218 P. 232 (1923).

7. *See Hudson v. Columbian Transfer Co.,* 137 Mich. 255, 100 N.W. 402, 403 (1904); *Howell v. Smith,* 258 N.C. 150, 128 S.E.2d 144 (N.C.1962).

8. *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634, 639 (1977), gives a concise discussion of contract formation. The court stated that an offer, acceptance, and consideration are the "basic ingredients of a contract." Further, "[a]ny act or promise which is of benefit to one party or" detriment "to the other is a sufficient consideration to support" the formation of a contract. Finally, the court noted that "a subjective understanding is not" a requirement. It is sufficient "that the conduct of the contracting parties indicates an agreement." *Id.* at 640. In the present case, the undercover agent made an offer to purchase marijuana from appellee. Appellee accepted the offer, stating that she would buy the marijuana when it became available and that the agent could then pay her back. The promise of payment offered for the drugs could be viewed as consideration for the agreement. The elements of a contract were present.

9. At least one judge in *Anzalone,* 43 MJ at 324, wrote that "determination of what" constitutes "criminal conduct may take into consideration the question of social harm to be prevented." (Opinion of Crawford, J.)

10. *See* Marcus, *Conspiracy: The Criminal Agreement in Theory and in Practice,* 65 Geo. L.Rev. 925, 929 (1977).

11. *See United States v. Rabinowich,* 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915), noting that conspiracy "involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices."

point are often cited as contributory factors to the increased danger inherent in group crimes.[12]

The purpose of criminal law, and therefore the rationales for conspiracy outlined above, take on heightened significance in military justice. The United States Armed Forces play a unique and vital role in society. The members of the military pledge their commitment to protect and defend the Nation. To prepare for and perform its role, the military must insist upon a respect for duty and discipline unparalleled in civilian society. Based on this reasoning, in *United States v. Bickel*, 30 MJ 277 (1990), this Court held that contraband obtained during a search which was allegedly improper under civilian law could be used as evidence despite the impropriety of the search because of the unique position of the military and the need to ensure the readiness of military units.[13] In short, the need to punish and deter socially undesirable behavior is particularly strong in military justice due to the character of the military and its paramount role in the defense of the nation.[14]

It is significant that this case is a drug conspiracy case. Statistics reveal that drug-related charges account for a substantial portion of military cases each year.[15] Drugs pose a special threat to the function of the military, and drug-related offenses in the military therefore demand consistent and stringent punishment.[16] In *Murray v. Haldeman*, 16 MJ 74, 78 (CMA 1983), the majority repeated earlier observations that possession of drugs by military personnel "is a matter of immediate and direct concern to the military as an act intimately concerned with prejudice to good order and discipline or to the discredit of the armed forces." Similarly, in *United States v. Bickel, supra*, this Court determined that drugs diminish the

---

12. Conspiracy promotes psychological reinforcement because plurality of members exerts social pressure against an individual's decision to reject commission of the substantive offense. Consequently, even if one member withdraws from the conspiracy, other conspirators may still complete the act the withdrawn member helped to orchestrate.

   The effectiveness of a crime is increased through conspiracy due to the increased number of participants. The existence of numbers, it could be argued, facilitates division of labor, which promotes the efficiency with which a given object can be pursued. This makes possible attainment of objects more elaborate and ambitious than otherwise would be attainable. Related to this concept is the idea that an increase in numbers is likely to result in more harm than that which would be produced by an individual acting alone.

   Finally, the presence of a group with criminal objectives provides a continuing focal point for further crimes, either related to or unrelated to those immediately planned.

   For a more complete discussion of these rationales and their contributory factors, see Burgman, *Unilateral Conspiracy: Three Critical Perspectives*, 29 DePaul L.Rev. 75 (1979).

13. *See also United States v. Middleton*, 10 MJ 123 (CMA 1981).

14. In *Anzalone*, 43 MJ at 324, the lead opinion described the important relationship between the *actus reus* of conspiracy and dangerousness, as follows.

   Here the focus on dangerousness is on the accused and what he might do to implement his conspiracy, thinking he has the support of a second person.... The FBI agent is not going to act in furtherance of the conspiracy; however, the accused, feeling he has cognitive support for the conspiracy, may very well act in furtherance of the conspiracy. Thus, here there are more than just evil thoughts. These are deeds being carried out by an accused which may result in harm to other individuals just in obtaining the classified information.

15. In fiscal years 1997 and 1998, 57% and 39% of Air Force cases, respectively, involved drugs. In fiscal years 1997, 1998, and 1999, 28%, 30%, and 31% of Army cases, respectively, involved drugs. To date, 31% of the Army cases in 2000 have involved drugs.

16. In fiscal years 1972 and 1973, "86,000 servicemen underwent some type of rehabilitation for drug abuse ... and only 52% of these were able to return to duty after rehabilitation." *See Murray v. Haldeman*, 16 MJ 74, 78 (CMA 1983), quoting *Schlesinger v. Councilman*, 420 U.S. 738, 761 n. 34, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). In fiscal year 1999, the percentage of positive results from urinalysis tests for the presence of illicit drugs increased in the Air Force, Navy, and Army. *See* Brinkley, *Agony of Ecstasy*, Navy Times of June 26, 2000, at 14. In *United States v. Rivers*, 49 MJ 434, 438 (1998), this Court quoted Major General Keane's memorandum on Physical Fitness and Physical Training, in which he expressed his view "that a soldier's body is a weapon system, and that our charge as commanders is to help our soldiers condition their bodies and avoid abusing them."

military effectiveness of servicemembers who are using drugs. When such persons are entrusted with important responsibilities, sometimes involving access to complex equipment or to lethal weapons, it may endanger other persons, their property, or government property. In *Bickel* this Court cited Article 112a of the Uniform Code of Military Justice, 10 USC § 912a, through which Congress specifically forbade drug use in the military out of concern for the dangers resulting from use of controlled substances by servicemembers. *See* 30 MJ at 283. Finally, in *United States v. Jackson*, 48 MJ 292, 295 (1998), the majority stated: "Physical and mental fitness are the quintessential requirements of military readiness. The use of illegal drugs significantly diminishes the user's physical and mental capabilities...."

Because drugs pose a particular threat to the unique duties of military personnel and because military justice necessarily must create a more disciplined environment than exists in civilian society, it is imperative that drug offenses in the military be punished severely. The goal in adjudicating this case

is to punish appellee for what she did and to deter her, and others, from selling drugs in the future. As far as appellee was concerned, she was involved in a conspiracy. She was prepared to follow through with the drug sale she planned with her "coconspirator." Such behavior on the part of an Army private, with the attendant danger associated with group crime, should be punished for what appellee believed her act to be: a conspiracy. To do so is to act in the best interest of military justice and to aim as strenuously as possible to combat the serious threat of drugs in the military.[17]

A final policy motive for appellee's conspiracy conviction is the consequences the majority's decision could have for classified cases. In classified cases the identity of the coconspirator, as either an undercover agent or a willing coconspirator, may not be known. The majority's strict bilateral view of the requisite "agreement" would prevent conspiracy convictions in such cases. Under the majority view, there must be at least two parties who sincerely intend to follow through with the substantive offense in order

---

**17.** In his work *Nichomachean Ethics*, Aristotle puts forth a theory of human behavior that associates virtue with the habitual rehearsal of good acts. He writes that moral virtue is acquired by the repetition of acts that avoid excess and defect. Artistotle further asserts that moral action is done by choice and that the object of choice is the result of previous deliberation. Aristotle, *Nichomachean Ethics* 348–55 (W.D. Ross trans. 1952).

Saint Thomas Aquinas, in his lauded work *Summa Theologica*, brings Aristotle's discussion of moral virtue into the legal realm. Aquinas writes:

[A] man needs to receive this training from another, through which to arrive at the perfection of virtue.... But since some [persons] are found to be depraved, and prone to vice, and not easily amenable to words, it was necessary for such to be restrained from evil by force and fear, in order that at least they might cease from evil-doing and leave others in peace, and that they themselves, by being accustomed in this way, might be brought to do willingly what hitherto they did from fear, and thus become virtuous. Now this kind of training, which compels through fear of punishment, is the discipline of laws. Therefore, in order that man might have peace and virtue, it was necessary for laws to be framed[.]

T. Aquinas, *Summa Theologica* 227 [Question XCV, Article I, Objection 3] (Fathers of the English Dominican Province trans.1952).

What Aristotle and Aquinas add to the analysis of this case is support for the need for criminal law to reinforce socially desirable behavior and to thwart socially undesirable behavior. Conspiracy poses a special threat to society because of the dangers inherent in group criminal activity. According to Aquinas, laws are required to combat these dangers by curbing human behavior, first through fear, but eventually by reshaping a would-be criminal's will. Aristotle adds that it is the repetition of good behavior that causes one to possess moral virtue. Thus, laws, and the punishment entailed by breaking them, force one to learn socially desirable behavior, and to eventually act in a socially desirable way through one's own will. If military justice truly wishes to prevent conspiracies, particularly drug-related conspiracies for the compelling reasons mentioned above, then it must repeatedly instill in the minds of military personnel that conspiracies are severely punishable. A defendant who, emboldened by the support of peers, demonstrates that she is actively prepared to engage in a conspiracy, and who in fact believes that she is engaging in a conspiracy in a given situation, should be punished as a conspirator. This should be the case even if her sole coconspirator had no intention to follow through with the substantive offense.

for an agreement to be present. The inability to identify the true intentions of one of the parties would automatically negate the "agreement" element of a conspiracy. This could, in effect, provide an unintended escape hatch for a defendant from the crime of conspiracy. The participants in actual conspiracy situations might not be convicted as conspirators under the bilateral approach. This is particularly disadvantageous in drug-related military cases, such as this one, where a chief goal of the court should be to combat the deleterious effect of drugs in the military.[18]

> The majority states:
>
> For this Court retroactively to introduce an entirely new [unilateral] theory of conspiracy that was not contemporaneously in the minds of the legislators or discussed by them would seem to cross the line between judicial interpretation and improper judicial lawmaking and cannot be justified by the "public policy" conditions advanced in Chief Judge Crawford's dissent.

54 MJ at 190. This is an inaccurate interpretation of the public-policy rationales I offer above.

In *McCulloch v. Maryland,* 17 U.S. (4 Wheat 159, 200) 316, 407, 4 L.Ed. 579 (1819), the eminent Chief Justice Marshall opined:

> A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. It would, probably, never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American constitution, is not only to be inferred from the nature of the instrument, but from the language. Why else were some of the limitations, found in the 9th section of the 1st article, introduced? It is also, in

some degree, warranted, by their having omitted to use any restrictive term which might prevent its receiving a fair and just interpretation. In considering this question, then, we must never forget that it is a *constitution* we are expounding.

In *Hurtado v. California,* 110 U.S. 516, 530, 4 S.Ct. 111, 28 L.Ed. 232 (1884), the Court reasoned:

> It is more consonant to the true philosophy of our historical legal institutions to say that the spirit of personal liberty and individual right, which they embodied, was preserved and developed by a progressive growth and wise adaptation to new circumstances and situations of the forms and processes found fit to give, from time to time, new expression and greater effect to modern ideas of self-government.

In *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 596, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), Justice Frankfurter (concurring) summarized the idea that the Constitution is a "living document":

> The pole-star for constitutional adjudications is John Marshall's greatest judicial utterance that "it is a *constitution* we are expounding." *McCulloch v. Maryland,* 4 Wheat. 316, 407, 4 L.Ed. 579. That requires both a spacious view in applying an instrument of government "made for an undefined and expanding future," *Hurtado v. California,* 110 U.S. 516, 530, 4 S.Ct. 111, and as narrow a delimitation of the constitutional issues as the circumstances permit. Not the least characteristic of great statesmanship which the Framers manifested was the extent to which they did not attempt to bind the future. It is no less incumbent upon this Court to avoid putting fetters upon the future by needless pronouncements today.

Several military cases have embraced the same principle. In *United States v. Trottier,* 9 MJ 337 (1980), this Court dealt with the question whether use of drugs by military persons had special military significance. In responding to the Government's request for

---

18. *See* discussion, nn. 15–16, *supra.*

this Court to overrule its prior decisions on the issue, the majority wrote:

> The law is not an end in itself; more properly it is a means to accomplish the ends of an ordered society. When change occurs in the conditions of that society upon which the law is based, the law, in turn, must respond thereto.

*Id.* at 344. Referring to the Constitution, the Court continued:

> It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time.

*Id.* (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 442, 54 S.Ct. 231, 78 L.Ed. 413 (1934)). It reasoned that "while the jurisdictional test of service connection may remain firm, its application must vary to take account of changing conditions in the military society." 9 MJ at 345.

In *United States v. Minnifield,* 9 USCMA 373, 26 CMR 153 (1958), this Court considered whether an accused's handwriting exemplar was a "statement" within the meaning of Article 31, Uniform Code of Military Justice, 10 USC § 831. In drawing its conclusion this Court referred to the Uniform Code of Military Justice as a "living document" and concluded that "it is a liberal and enlightened, rather than a narrow and grudging, application of Article 31 that is best calculated to insure to the military the preservation of our traditional concepts of justice and fair play." *Id.* at 379, 26 CMR at 159.

The general idea behind these excerpts is that the times do change, and the judicial interpretation of legal documents must shift accordingly. The military cannot tolerate drug use. Its role in society is too precious to punish drug use any less severely than my dissent advocates. What the majority labels as a retroactive introduction of "an entirely new theory of conspiracy that was not contemporaneously in the minds of the legislators or discussed by them" is not "improper judicial lawmaking," but rather an attempt to account for "changing conditions in military society." This Court must face the corruption head-on, interpret the Code in a "liberal and enlightened" manner, and apply rigorous standards of punishment that will most effectively eradicate the problem of drug use in the military.

As I argue above, there is case law that supports the unilateral theory. But even if this point is not conceded, public policy does justify implementation of a unilateral approach to conspiracy. The role of the military in society is too important to allow the judiciary to apply a rigid interpretation of the law that does not account for evolving circumstances and needs.

The majority notes that my approach exceeds the scope of its rationale because the unilateral theory would have to be applied not only to drug conspiracies but to all conspiracies. I need only remind the majority that a substantial proportion of military cases concern drug use.

The majority contends that this Court is not justified in adopting the unilateral theory because, although the civilian community is concerned with drug abuse, its drug conspiracy statute, 21 USC § 846,[19] does not incorporate the unilateral theory. However, this is a case of statutory interpretation.

Just as the majority misinterprets Article 81, UCMJ, 10 USC § 881, the majority further infers that, pursuant to Article 36 of the Code, 10 USC § 836, military justice should follow the "principles of law" as to substantive crimes generally recognized in the civilian federal district courts. 54 MJ at 191. Article 36 provides that the President may prescribe rules of "[p]retrial, trial, and post-trial procedures, including modes of proof ... and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts...." *See, e.g., United States v. Scheffer,* 523 U.S. 303, 307 n. 2, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

---

19. This section provides:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

However, this is not a case involving "modes of proof" or "rules of evidence," but rather one of statutory interpretation concerning what constitutes a substantive crime. I reject the majority's inference. *Cf. United States v. McElhaney*, 54 MJ 120 (2000); *United States v. Dowty*, 48 MJ 102 (1998).

In this instance, we should not be limited by the perspective of the civilian statute which is different from Article 81. As I argued above, military society is distinctly different from civilian society, and military justice must be administered accordingly. Congress has recognized this difference by establishing a separate system of justice for the military that includes judicial oversight by this civilian Court.

Finally, the majority believes that the statute at bar, Article 81, is unambiguous in its adoption of the bilateral approach. I disagree. The federal statute, 18 USC § 371, provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

Article 81, substantively unchanged since 1950, provides:

> Any person subject to this chapter who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct.

Article 81 is distinguished by its provision that a person "who conspires with *any* other person to commit an offense" (emphasis added) provided there is an overt act "to effect the object of the conspiracy" constitutes conspiracy. As to whether there is an agreement, Article 81 is ambiguous. It does not say whether we determine the existence of an agreement based on the defendant's state of mind or the state of mind of the defendant's co-conspirators. Because the statute is ambiguous, we must consider the purpose behind the statute. Certainly one of the

purposes is to prevent conspiracies. When there are multiple parties to a crime, the lowest common denominator will be the lowest ethical conduct. When there is more than one party to the crime, others become emboldened. Thus, we should examine the defendant's state of mind as to his expectation of support.

As I indicated earlier, several non-military cases prior to the adoption of the Code favored a unilateral approach to conspiracy. 54 MJ at 194. Historically, the unilateral theory of conspiracy was in existence and had been recognized in some jurisdictions prior to the drafting and enactment of the Code. This historic fact, coupled with the obvious difference between the language of the federal civilian statute, 18 USC § 371, and Article 81 of the Code, cast doubt on the majority's assertion that the unilateral theory is an "entirely new theory of conspiracy," 54 MJ at 190. For all of the above-mentioned reasons, I believe that there is a compelling argument to adopt and apply the unilateral theory of conspiracy.

### IV. The Alternative: Attempted Conspiracy

The most compelling objection to adoption of a unilateral approach to the offense of conspiracy on the part of military justice is the argument that existence of attempted conspiracy precludes the need for a conspiracy analysis in this case. In *United States v. Anzalone*, 43 MJ 322, 323 (1995), this Court held that the Uniform Code of Military Justice "does not prohibit a charge of attempted conspiracy where there is a purported agreement between a servicemember and an undercover government agent". *See id.* at 327 (Sullivan and Wiss, JJ., each concurring in the result). Furthermore, in *United States v. Lawrence*, 47 MJ 75 (1997), Judge Sullivan wrote in his concurring opinion that a plain reading of the Uniform Code of Military Justice (§§ 880–881) reveals that there is a crime of attempted conspiracy in the federal criminal code that governs the military. An agreement between a defendant and a law enforcement agent is attempted conspiracy. *See* 47 MJ at 75.

If the court-martial can convict the defendant of attempted conspiracy, why do we need to even evaluate the existence of an agreement? A conviction of attempted conspiracy would eliminate the debate surrounding the bilateral versus unilateral approach to conspiracy. However, the above discussion concerning the purpose of military justice and the particular threat drugs pose to the military suggests that conspiracy would be a more appropriate conviction. The dangers inherent in group criminal activity, specifically to group criminal activity involving drugs, have the severest of consequences for the military and its vital role in society. To make the point that conspiracy in the military cannot be tolerated, a conspiracy conviction should be permitted even when the sole coconspirator is an undercover agent.

Accordingly, I would answer the certified question in the affirmative and would reverse the decision below setting aside appellee's conviction for conspiracy.